UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
RICHARD J. MCCORD, AS CHAPTER 7
TRUSTEE FOR THE BANKRUPTY
ESTATES OF USA UNITED FLEET INC.,
USA UNITED TRANSIT INC.,
USA UNITED BUS EXPREESS INC.,
TOM TOM ESCORTS ONLY, INC.,
NORTHEAST TRANSIT, INC., NORTHEAST
BUSES, INC., and NORTHERN TRANSIT, INC.,

                                             Plaintiff,

      -against-                                      Case No. 11-cv-2140-NGG-SMG

DIVISION 1181 AMALGAMATED TRANSIT
UNION NEW YORK EMPLOYEES PENSION
FUND, DIVISION 1181 AMALGAMATED                **SECOND AMENDED**
TRANSIT UNION NEW YORK WELFARE                   **COMPLAINT**
FUND, NEW YORK CITY DEPARTMENT
OF EDUCATION, and LOCAL 1181-1061
AMALGAMATED TRANSIT UNION, AFL-CIO,      **DEMAND FOR JURY TRIAL**

                                          Defendants.

------------------------------------------------------------------X

        Plaintiff, Richard J. McCord, as Chapter 7 Trustee for the bankruptcy estates of USA

United Fleet Inc., USA United Transit Inc., USA United Bus Express Inc., Tom Tom Escorts

Only, Inc., Northeast Transit, Inc, Northeast Buses, Inc. and Northern Transit, Inc., through his

attorneys, Certilman Balin Adler & Hyman, LLP, complaining of defendants herein, respectfully

shows and alleges as follows:

### JURISDICTION AND VENUE

      1.      Jurisdiction of the Court arises pursuant to 28 U.S.C. §§ 1331 and 1337, 29 U.S.C.

§§ 158(b) and 185; Section 501(e)(1) of ERISA, and Section 301 of LMRA.

      2.      Venue is proper in this district pursuant to 29 U.S.C. §§ 1132(e)(2) and 1391 and

Section 502(e)(1) of ERISA.

1

**PARTIES**

3.      Richard J. McCord, Esq. ("Plaintiff" or "Trustee") is the duly appointed Chapter 7

Trustee for the bankruptcy estates of USA United Fleet Inc., a/k/a Shoreline Fleet, Inc. ("Fleet");

USA United Transit Inc., a/k/a USA United Pupil Transit, Inc. ("Transit"); USA United Bus

Express Inc., a/k/a Shoreline Bus Express, Inc.; Tom Tom Escorts Only, Inc.  (collectively, the

"United Debtors"), and Northeast Transit, Inc., Northeast Buses, Inc., and Northern Transit, Inc.

(collectively, the "Northeast Debtors" and together with the United Debtors, the "Debtors").  The

Chapter 7 cases of the United Debtors and the Northeast Debtors are presently pending in the

United States Bankruptcy Court for the Eastern District of New York, before the Honorable

Jerome Feller, U.S.B.J., under the caption USA United Fleet Inc., *et al.*, Case No. 11-45875-jf.

4.      Upon information and belief, at all times hereinafter mentioned, the defendants,

Division 1181 Amalgamated Transit Union New York Employers Pension Fund (the "Pension

Fund") and Division 1181 Amalgamated Transit Union New York Welfare Fund (the "Welfare

Fund" and together with the Pension Fund, the "Funds"), were and still are pension and welfare

benefit Funds for transit workers located in the City and State of New York.

5.      Upon information and belief, at all times hereinafter mentioned, the defendant,

New York City Department of Education (the "DOE") was and still is a municipal corporation

owned and operated by the City of New York.

6.      Upon information and belief, at all times hereinafter mentioned, the defendant,

Local 1181-1061 Amalgamated Transit Union, AFL-CIO (the "Union") was and still is an

international labor union with a local chapter situated in the City and State of New York.

2511460-3

## PRELIMINARY STATEMENT

7.     On July 6, 2011 (the "United Petition Date"), each of the United Debtors commenced a voluntary case under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

8.     On July 29, 2011, the Court converted each of the United Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

9.     By Order dated July 29, 2011, Richard J. McCord, Esq. was appointed the Chapter 7 Trustee of each of the converted cases of the United Debtors.

10.     On August 10, 2011 ("Northeast Petition Date" and, together with the United Petition Date, the "Petition Dates"), the Northeast Debtors filed voluntary Chapter 7 cases and Richard J. McCord, Esq. was appointed as the Trustee in the Northern Debtors' cases, as well.

11.     Prior to the United Petition Date, the DOE and certain of the United Debtors, United Tom Tom Transportation, Inc., USA United Bus Express, Inc., USA United Fleet, Inc., and USA United Transit, Inc. (the "United Contract Holders"), entered into certain contracts relating to the provision of pupil transportation and escort services, as extended and amended from time to time, identified by DOE as contract numbers 6716573, 6988827, 6716572, 6716543, 6007069, 6007020, 6810828, 6716572 and 6932522 (the "Contracts").

12.     The Contracts run from July 1st through June 30th and are renewed annually.

13.     For the fiscal year ended June 30, 2010, the United Contract Holders received combined gross revenues of $75,292,524, which were 100% attributable to the Contracts. Plaintiff estimates from the limited books and records turned over to him by the United Contract Holders that combined net profits for fiscal 2010 (before deduction of extraordinary expenses for legal fees) amounted to approximately $1,000,000.

2511460-3

14.     The Contracts which are the subject of this action are the sixteenth extensions of the original Contracts between the United Contract Holders and DOE, dated June 25, 2010 (the "16th Contract Extension"), and run from July 1, 2010 through and including June 30, 2011 (the "2010-2011 Contract Year"). The 16th Contract Extension provides that, "[t]he extensions will run one (1) year with an additional two (2) one (1) year extensions from July 1, 2010 through June 30, 2013.  The estimated cost to the Department of Education over 3 years is $237,168,236."  Put another way, over the 3 year extension period, the United Contract Holders stood to earn an average of $79,056,079 in total gross revenues from the DOE Contracts.

15.     On or about October 18, 2010, the United Contract Holders requested DOE approval for the assignments of the Contracts to the Northeast Debtors, executed the requisite assignment forms between February 27, 2011 and March 1, 2011, and began the necessary approval process mandated by DOE.  Contract assignments do not become effective until they are registered by the New York City Comptroller.

16.     The Contract assignments were approved by DOE on March 14, 2011 and were registered with the New York City Comptroller between June 28, 2011 and June 30, 2011, thereby making the assignments effective in time for the Contract year beginning on July 1, 2011 and prior to the Chapter 11 filings by the United Debtors.

17.     Notwithstanding the foregoing, upon conversion of the cases of the United Debtors, two creditors asserting security interests in and to the buses sought relief from the automatic stay on shortened notice in order to obtain immediate possession of their collateral. The DOE indicated that it would offer the Contracts for bid to competing bus companies unless it obtained immediate assurance that the Contracts could and would be performed.

2511460-3

18.     Because of the imminent commencement of the 2011-2012 school year and DOE's stated intention to offer the Contracts out for bid, the Trustee filed an emergency motion on shortened notice to sell substantially all of the assets of the United Debtors and the Northeast Debtors, free and clear of liens, claims, encumbrances and interests (the "Liens"), with such Liens to attach to the proceeds of sale, and the assumption and assignment of certain executory contracts (including the DOE Contracts), and for certain related relief pursuant to an Asset Purchase Agreement ("APA") by and among the Trustee, the United Debtors, the Northeast Debtors, and MV Transportation, Inc. ("MV").  On August 15, 2011, the Bankruptcy Court approved the asset sale and the assumption and assignment of the Contracts from the Northeast Debtors to MV pursuant to the APA, for a purchase price of $8,177,717, a price insufficient to pay in full the blanket lien and security interests of the Debtors' primary secured creditor.

19.     The Closing of the transaction contemplated by the APA occurred on August 18, 2011, whereupon the Contracts were assigned to MV with the approval of DOE, and the bus transportation and escort services formerly performed by the Debtors were taken over and performed by MV for the Contract year July 1, 2011 through June 30, 2012.

## BACKGROUND FACTS

### Business of the United Debtors/United Contract Holders

20.     According to the Declaration of William Moran pursuant to Rule 1007-4 of the Local Bankruptcy Rules for the Eastern District of New York (the "Moran Declaration"), as of the United Petition Date, the United Contract Holders were a family-owned operation that, for more than thirty years, had transported handicapped public school children to and from school and school activities in New York City.  The United Contract Holders operated approximately 500 school buses daily, with each bus running every morning and afternoon, and often at other

5

times as well.  The buses are typically small buses, each operated by a bus driver and carrying an "escort" (an adult who rides the bus with the children).  Escorts are necessary to assist the handicapped children and to maintain discipline on the buses, allowing the drivers to focus on the safe operation of the buses along their route.  Virtually all of the drivers and escorts are members of the Union.  Union members receive benefits from the Welfare Fund and the Pension Fund to which the United Contract Holders contribute substantial sums every month, based on the number of covered employees working each month.

21.    Routes are assigned by the DOE through a competitive bidding process, which takes place on an annual basis before the commencement of the school year.  Payment to the bus companies which operate routes is made on a monthly basis by the DOE's Office of Pupil Transportation.  The amount of the payments are based on the number of routes driven, the number of days the buses were in operation that month, the price bid by the company to win the routes, and other factors.  Payment is rendered for services provided in the prior month and received via direct deposit into one checking account for all four of the United Contract Holders.

21.    Under the Collective Bargaining Agreement (the "CBA") between the United Contract Holders and the Union, the United Contract Holders make regular payments into the Funds.  These payments are significant.  For the 2010-2011 Contract Year, the United Contract Holders paid $1004.73 per union member each month into the Welfare Fund and $298.60 per month per union driver and $282.60 per month per escort to the Pension Fund.  Under the Welfare Fund's Policy on Employer in Good Standing, an Employer in Good Standing ("EIGS") is entitled to make 11 monthly payments over a period of 12 months.  This credit is not provided for any contribution, excluding amounts owed under a payroll audit, that is subject to an attachment and such attachment shall be for the full amount of the contribution provided under

6

2511460-3

the CBA (i.e., 12 monthly payments at 1004.73 payable over 12 months). The Pension Fund does not have Policy on Employer in Good Standing.

22.     The United Contract Holders determine the amount they are required to contribute to the Funds by employing a calculation formula that incorporates factors such as the number of employees, the number of working weeks, the welfare rate and so-called "shape factors," for workers who are often needed to fill spots, and deducts applicable credits. This is a complicated process that takes many facts into account that apply to that month only—in other words, records have to be reviewed and calculations performed each month to arrive at the correct amounts to contribute.

**Audits of Payroll Records Under CBA and Joint Policy Adopted by Funds Trustees**

23.     Under the CBA, the Funds are authorized to conduct audits of payroll records to determine whether Untied has made the appropriate contributions. Accordingly, the trustees of the Funds ("Fund Trustees") have adopted a Joint Policy for Collection of Delinquent Contributions (sometimes herein, the "Joint Policy"), which specifies certain requirements that pertain to audits.

24.     Under the DOE's Employee Protection Provisions ("EPP") contained in the DOE Contracts, the Funds' trust agreements and the Joint Policy adopted by the Funds, the Funds are required to conduct an audit every three years, or failing that, every five years, of a company's remittances and other records to ensure proper contribution to the Funds. If a delinquency is found, the Fund Trustees have the authority under the CBA—without recourse to the courts or even an administrative hearing—to order the DOE to "attach" the monies the DOE pays to the United Contract Holders and pay those monies instead to the Funds. DOE executes the Funds' attachment demands without question.

2511460-3

25.     The Funds conducted a payroll audit for the period from January 1, 2009 through April 30, 2010 for Transit and Fleet.

26.     On April 29, 2011, the Funds prematurely charged as "final" the amount of $363,354.60 against Transit and the amount of $777,967.00 against Fleet, and demanded that such amounts be attached against the DOE service payments due to Transit and Fleet under the Contracts.

27.     Upon information and belief, the $777,967.45 attached by the Funds in respect of the Fleet audit were turned over to the Funds by DOE, but a TRO restraining the same remains in effect.  The $363,354.60 attached by the Funds in respect of the Transit audit is being held by DOE pursuant to a "so ordered" stipulation dated May 12, 2011 and entered on May 13, 2011.

**Attachment Procedures**

28.     Pursuant to Article 45 of the DOE Contracts, known as the Employee Protection Provisions ("EPP"), in the event the USA United Plaintiffs default in the payment of their obligation to their respective employees under the CBA, the Union can seek the employer contribution directly from the DOE from the monies it owes to the USA United Plaintiffs under the Contracts.  More specifically, Section (I), Paragraph 5 of the 16th Contract Extension for the 2010-2011 Contract Year states:

> **5. Enforcement**.
>
> In addition to any other remedies provided in the contract between the Board [DOE] and the contractor [United Contract Holder], such as default and/or termination, if the contractor is found to be in violation of the foregoing Employee Protection Provisions regarding the payment of wages, welfare benefit contributions, pension contributions, or other aspects of compensation or benefits [to Union], ***then the Director of the Office of Pupil Transportation, within thirty (30) days of written notice***, shall withhold the appropriate amounts from any payments due to the contractor and pay them directly to the applicable union for the

8

> benefit of the employees affected, to the Division 1181 A.T.U.—
> New York Employees Pension Fund or other applicable union
> pension fund for the benefit of the employees affected or to the
> appropriate Welfare Fund for the benefit of the employees
> affected....

16th Contract Extension, at 26 (emphasis supplied).

29.     The United Contract Holders received the EIGS discount for the 2009-2010 Contract Year.

30.     Due to delays in the registration of the DOE Contract extensions for the 2010-2011 Contract Year, service payments from the DOE to the United Contract Holders were delayed for nearly 90 days, resulting in unavoidable delays in payments due to the Union/Funds.

31.     Upon information and belief, the United Contract Holders requested additional time to make contributions to the Funds due to DOE's failure to make timely payments to the United Contract Holders; however, the Funds adamantly refused to offer any flexibility or any accommodations and immediately began a cycle of attaching the DOE service payments.

32.     Attachments were placed against DOE's service payments in September and October, 2010.

33.     Furthermore, the Funds adopted a policy which determines contractors to be delinquent or Habitually Late Payer Employers ("HLPE") when two payments within a six-month period are not remitted when due or when payments are made through the attachment process. The policy governing HLPEs ("HLPE Policy") allows the Funds to elect to request a security deposit or certified checks, charge 18% interest as well as HLPE penalties for a period of 12 consecutive months.

34.     As a result of the attachments placed against DOE service payments in September and October, 2010, on November 2, 2010 the Union demanded that all future welfare

2511460-3

contributions be made timely in certified funds or wire transfers for a period of six months. In addition, the Welfare Fund elected to require a cash security deposit of $800,000 to be held without interest for a period of six months or until the United Contract Holders pay on time for a period of six months. The election of this remedy is not a mandatory policy of the Fund and was at the election of the Fund Trustees.

35. As the United Contract Holders were experiencing a "cash crunch" due to delays in DOE service payments, they requested that a bond be set in lieu of the cash security deposit. As such a bond was accepted by the Welfare Fund in other circumstances and from other contractors, the Fund Trustees agreed to accept a bond. Consequently, the Fund accepted a bond in the face amount of $1,000,000 for the period of payments accrued from November 2, 2010 through April 26, 2011 (subsequently extended through a continuance certificate to a period in 2012).

36. In November and December 2010, the USA United Plaintiffs wired the Union monies due for employees' welfare contributions and delivered certified checks to the Union for employees' pension contributions.

37. On December 27, 2010, the welfare contribution for November 2010 in the amount of $826,989.38 was wired to the Fund while the office was closed for winter recess. Four (4) checks totaling $427,510.84 were mailed to the Union at approximately the same time. However, since the office was closed, the checks were left with the Union security department.

38. On January 3, 2011, the Funds, without any prior written notice and without any opportunity for reconciliation, made a demand upon DOE to attach the service payments due to the United Contract Holders for November 2010 in the amount of more than $1,000,000. The United Contract Holders believed such attachment was because the Funds were unaware of the

10

wire transfer and check delivery on or about December 27th.  Consequently, the United Contract Holders placed stop payment orders on the $427,510.85 in checks.

39.    Also in January 2011, without the requisite thirty (30) day notice, referred to in the quoted provisions of paragraph 28 above, withheld $1,159,668.70 from service payments due to the United Contract Holders for December 2010 contributions.

40.    The Funds claimed that $1,159,668.70 in attachments from DOE service payments for services provided by the United Contract Holders in December 2010 (which is a small revenue month due to winter recess) were not double payments of the amounts paid on December 27th but, rather, were attributable to various other charges and alleged compilations of contribution shortages which were not determined by the appropriate audit process.

41.    The Union merely alleged an underpayment to the Pension Fund and the Welfare Fund, and the DOE withheld service payments due under the Contracts from the United Contract Holders and paid the alleged underpayment to the Union.

42.    The Union explained later that the attachment was for a previous period, but the Union failed to properly identify the period for which the contributions were owed.

43.    Because of the lack of notice to the United Contract Holders, they did not have any opportunity to contest, review or audit the amounts demanded by the Union as underpayments.

44.    Essentially, the Funds received a double payment in December 2010 because of the payments made on December 27th and the January 2011 attachment in the amount of $1,159,668.70.

45.    Upon information and belief, the failure by DOE to give the requisite notice of the attachment and by the Union/Funds to properly identify the period for which the attachment was

11

being made resulted in an overpayment by the USA United Plaintiffs in the amount of over $800,000.

46.     The United Contract Holders requested that the December over-attachment be applied toward the DOE January remittance. However, the Funds asserted that any credits owed would have to be worked out through the audit process.

47.     Due to the overpayment, the United Contract Holders were unable to remit payments to the Funds for January 2011, and in February 2011 the Funds again attached the DOE service payments in the amount of $1,714,479.88, while only $310,191.27 was paid to the United Contract Holders.

48.     During this time period, the Funds were also attaching the DOE service payments for greater and unsubstantiated amounts than were reflected in United's monthly remittance reports.

49.     Although the Welfare Fund was already secured by a bond in the face amount of $1,000,000, the Pension Fund now requested a security deposit to cover amounts allegedly owed to the Pension Fund.

50.     The United Contract Holders responded to the Pension Fund's request for a cash security deposit in a similar manner as described above for the Welfare Fund and, on February 28, 2011, requested that the Fund Trustees accept a bond in place of the cash security deposit.

51.     On March 11, 2011, the United Contract Holders received a response from the Funds indicating that the Funds would accept a bond in place of the cash security deposit, subject to certain terms and conditions, including a continuation of the Welfare Fund bond and naming the Northeast Debtors (as Contract assignees).

2511460-3

52.    On March 14, 2011, the United Contract Holders and the Northeast Debtors notified the Funds of their acceptance of the terms and conditions proposed by the Funds.

53.    The United Contract Holders and the Northeast Debtors obtained the bonds and notified the Union.  Although the bonds are dated March 17, and March 18, 2011, the United Contract Holders received verbal confirmation that the bonds were approved on March 15, 2011.

54.    On March 16, 2011, after United/Northeast had obtained the bonds and notified the Funds it had obtained same, the Funds retracted their offer to accept the bonds (which offer had already been accepted by United/Northeast) and immediately demanded a cash security deposit in substitution for the bond securing the Welfare Fund and for the amount requested by the Pension Fund.

55.    Although the parties continued to negotiate from March 16, 2011 through late April 2011 and agreed in principle that the Funds would accept the bonds instead of cash security deposits, a written agreement was never prepared.

56.    The Funds demanded that the amount of $1,213,744.19 be attached against the DOE service payments due to the United Contract Holders for a security deposit pursuant to the Funds' Joint Policy for Collection of Delinquent Contributions.

57.    On or about April 27, 2011, USA United Fleet Inc., USA United Transit Inc. USA, United Bus Express Inc. and Tom Tom Escorts Only, Inc. (the "United Plaintiffs") commenced litigation in the Supreme Court of the State of New York, County of Richmond, Index No. 101786/11, against the Pension Fund, the Welfare Fund, and DOE, which was removed by the Funds to the United States District Court for the Eastern District of New York, under Index No. 11-cv-02140 prior to the United Petition Date, seeking, among other things, an injunction

13

prohibiting DOE to turn over to the Funds the amounts attached in connection with the audit for the period January 1, 2009 through April 30, 2010, and the cash security deposit.

58. The United Plaintiffs served a Notice of Claim on DOE pursuant to Education Law §§ 2562.

59. Pursuant to Stipulation dated May 12, 2011 and entered by this Court on May 13, 2011, DOE is currently holding $1,577,292.79, consisting of $1,213,744.19 in contested funds attached by the Union/Funds for a security deposit pursuant to the Funds' Joint Policy for Collection of Delinquent Contributions and $353,548.60 for amounts allegedly owing to the Funds on account of the payroll audit of USA United Transit Inc. for the period January 1, 2009 through April 30, 2010.

60. This action was stayed by the filing of the Chapter 11 cases of the United Plaintiffs, but the automatic stay was modified to permit the action to proceed by Stipulation and Order approved by the Bankruptcy Court on March 14, 2012.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR A DECLARATORY JUDGMENT

61. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

62. Plaintiff seeks a declaration by the Court to determine the rights and legal relations of the parties herein.

63. Plaintiff applies to this Court to establish the following rights, facts, legal relations and obligations of the parties as of the commencement of this action:

   (a)   The United Plaintiffs are not in default of the CBA with defendant Union.

   (b)   The Untied Plaintiffs are not Habitually Late Paying Employers ("HLPE") of contributions to the defendant Funds.

14

2511460-3

(c)     The United Plaintiffs are not obligated to post any security deposit with the defendant Funds.

(d)     The United Plaintiffs' Contracts with defendant DOE do not entitle it to withhold monies to fund defendants Funds' demands for a security deposit.

(e)     The United Plaintiffs' Contracts with defendant DOE requires thirty (30) days written notice to the United Plaintiffs prior to any withholding of service payments due to the United Plaintiffs.

(f)     Defendant DOE has failed to follow the terms of its Contracts with the United Plaintiffs by executing the Funds' attachment demands without abiding by the thirty (30) day notice provision prior to withholding service payments due to the United Plaintiffs.

(g)     Defendant DOE did not withhold appropriate amounts from service payments payable to the United Plaintiffs.

(h)     The United Plaintiffs may post a bond in lieu of any cash security deposit required by defendants Funds.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR BREACH OF CONTRACT
### (Against the Union/Funds)

64.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65.     The CBA constitutes a valid, binding and enforceable contract between the United Plaintiffs, on the one hand, and the Union, on the other, and governs the terms of the management, operations, and procedures for the Union.

66.     Pursuant to Section 11(h) of the CBA, the United Plaintiffs are "bound to . . . policies and procedures adopted by the [Funds] Trustees," including the Joint Policy.  Moreover,

2511460-3

the Joint Policy is incorporated by reference into the CBA, a valid, binding and enforceable contract to which the United Plaintiffs are a party.

67.    The United Plaintiffs are third-party beneficiaries of the Joint Policy, which expressly references the Employers.

68.    Section 4, Paragraph 7 of the Joint Policy provides as follows:

> After a payroll audit of an Employer is conducted, an auditor shall review with the Employer the payroll audit findings.    After providing the Employer with a reasonable time to respond to the findings, the auditor shall issue a final report.

69.    Section 4, Paragraph 10 of the Joint Policy further provides as follows:

> The Trustees shall provide written notice of the payroll audit findings and shall not pursue remedies pursuant to the Employer Protection Provisions until the earliest, four (4) weeks after the date of notice of payroll audit findings, and during this four (4) week period, the Trustees and the Funds' administrative staff will endeavor in good faith to resolve all disputes regarding the audit....   If a written response to a payroll audit is received, the Fund will reply thereto in writing...."

70.    Both Transit and Fleet submitted objections and comments to the draft Reports, in writing, to the Funds prior to the alleged "final" report being issued.

71.    The alleged "final" reports were issued for the period from January 1, 2009 through April 30, 2010 for both Transit and Fleet before the auditor reviewed the objections and comments from Transit and Fleet.

72.    In order for there to be an attachment from the service payments due to Transit and Fleet from DOE, there must be a finding of a violation of the EPP and a finding by the Funds Trustees of a final amount due to the Funds.

2511460-3

73.     Upon information and belief, there was no finding by the Funds Trustees of the amount due from either Transit or Fleet for the auditors for the period January 1, 2009 through April 30, 2010.

74.     A determination by the Funds Trustees, or at least a good faith determination by the Funds Trustees, of an amount due to the Funds from Transit and Fleet were not complete and the adjustment procedures were still ongoing between Transit and Fleet, on one hand, and the Funds' auditors, on the other, when the Funds invoked the attachment procedure.

75.     In fact, on May 12, 2011, after the Funds attached the service payments due to Transit from defendant DOE, the Funds' auditor reduced the amount claimed from Transit by $61,212.13. The audit is still not final.

76.     On June 8, 2011, the Funds attached Fleet's service payments from defendant DOE in the sum of $777,967.54, when, on information and belief, Fleet's actual obligations are only approximately $11,000.00.

77.     The United Plaintiffs have performed all of their obligations under the CBA, which incorporates by reference the Joint Policy.

78.     The Funds have breached the Joint Policy by and through the conduct described above, including, *inter alia*, (1) denying Transit and Fleet an opportunity to review the audit findings with the auditor, and a reasonable time to respond to the audit findings, as required by Section 4, Paragraph 7 of the Joint Policy; (2) improperly providing written notice of payroll audit findings that they knew were not final, and prematurely triggering the four week review period; and (3) refusing to resolve in good faith Transit's and Fleet's disputes regarding the audits but instead sending notice to defendant DOE announcing their intent to attach the full, fictitious and inflated amount from Transit's May 2011 service payment and from Fleet's June

2511460-3

2011 service payment. In addition, the Funds attempted to attach $1,213.744.19 from DOE service payments for cash security deposits without providing the requisite thirty (30) day notice.

79.      As a direct and proximate result of defendants Union's and Funds' wrongful conduct and breaches of contract, the estates of the United Plaintiffs have been damaged in over-attachments in an amount to be proven at trial but not less than $2,407,097.

**AS AND FOR A THIRD CAUSE OF ACTION FOR BREACH OF**
**IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against the Union/Funds)**

80.      Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 79 as if fully set forth herein.

81.      The CBA constitutes a valid, binding and enforceable contract between the United Plaintiffs, on the one hand, and the Union, on the other, and governs the terms of the management, operations, and procedures for the Union.

82.      Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.

83.      Section 11, Paragraph (a)(2) of the CBA sets forth the United Plaintiffs' obligations to make contributions to the Welfare Fund for welfare benefits on behalf of union drivers and union escorts, inclusive of obligations for new hires, recipients of workers' compensation, drivers on leave, and drivers on disability.

84.      Section 14, Paragraph (a)(2) of the CBA sets forth the United Plaintiffs' obligations to make contributions to the Pension Fund for pension benefits on behalf of union drivers and union escorts, inclusive of obligations for new hires, recipients of workers' compensation, drivers on leave, and drivers on disability.

2511460-3

85.     Upon information and belief, it is the Funds' practice to contact DOE, ascertain the number of routes operated by the United Plaintiffs for any given period, and assume benefits are owed for one driver and one escort per route plus respective driver and escort shapes.  While this methodology may be a shorthand approximation of the number of drivers and escorts employed by the United Plaintiffs, it is inaccurate for purposes of calculating exact pension and welfare benefits owed to Union members employed by the United Plaintiffs. The correct procedure to obtain accurate contribution amounts would be to use the United Plaintiffs' remittance reports.

86.     This flawed methodology was, upon information and belief, intentionally employed by the Funds fails so as not to give the United Plaintiffs any credits for (a) new hires who receive no Union pension and welfare benefits for the first 3 months for pension and 6 months for welfare (and therefore no employer contributions); (b) drivers on workers' compensation; (c) drivers on leave; and (d) drivers on disability.

87.     The United Plaintiffs prepare and submit monthly remittance reports containing precise information regarding all Union employees entitled to welfare and pension benefits and the amount to which they are entitled, which was purposefully ignored by the Funds in making its calculations regarding the amount of benefit contributions which the United Plaintiffs are obligated to make.  This results in inflated amounts claimed by the Funds for welfare and pension benefits and inappropriate over-attachments of the DOE service payments due to the United Plaintiffs.

88.     By reason of the foregoing, defendants Union and Funds have breached the implied covenant of good faith and fair dealing inherent in the CBA.

19

89.     As a direct and proximate result of defendants Union's and Funds' wrongful conduct and breach of the implied covenant of good faith and fair dealing, the estates of the United Plaintiffs have been damaged in over-attachments in an amount to be proven at trial but not less than $1,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against the Union and the Funds)

90.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 89 as if fully set forth herein.

91.     As of the commencement of this action, the United Plaintiffs were parties to Contracts with defendant DOE pursuant to which they provided bus transportation and escort services for New York City schoolchildren, which included Employee Protection Provisions set forth in Section (I), Paragraphs 1 through 9, of the 16th Contract Extension.

92.     Section (I) Paragraph 3 of the DOE Contracts for Contract Year 2010-2011 provides for monthly welfare benefits to be contributed by the United Plaintiffs to the Welfare Fund on behalf of all qualified Union employees.

93.     Section (I), Paragraph 4 of the DOE Contracts for Contract Year 2010-2011 provides for the United Plaintiffs to participate in the Division 1181 A.T.U.—New York Employees Pension Fund and Plan and contribute $74.40 per week per driver and escort for 40 weeks each year, and withhold $38.50 per week per driver and 28.40 per week per escort, for 40 weeks each year from the paychecks of said drivers and escorts.

94.     Section (I), Paragraph 5 of the DOE Contracts for Contract Year 2010-2011 provides that, if the United Plaintiffs are found to be in violation of the EPP "regarding payment of wages, welfare benefit contributions, pension contributions, or other aspects of compensation

2511460-3

or benefits, then the Director of the Office of Pupil Transportation, within thirty (30) days of written notice, shall withhold the appropriate amounts from any payments due to the contractor and pay them directly to the applicable union for the benefit of the employees affected, to the Division 1181 A.T.U.—New York Employees Pension Fund . . . or to the appropriate Welfare Fund for the benefit of the employees affected."

95.     Upon information and belief, defendant Funds bill the United Plaintiffs for pension and welfare contributions by methods which ignore United Plaintiffs' employee records and rely solely on those of the DOE.

96.     Upon information and belief, the Funds contact DOE and ascertain the number of routes operated by the United Plaintiffs for any given period and assumes one driver and one escort per route plus respective driver and escort shapes.  While this methodology may be a shorthand approximation of the number of drivers and escorts employed by the United Plaintiffs, it is inaccurate for purposes of calculating exact pension and welfare benefits owed to Union members employed by the United Plaintiffs. The correct procedure to obtain accurate contribution amounts would be to use the United Plaintiffs' remittance reports.

97.     This flawed methodology employed by the Funds fails to give the United Contract Holders any credits for (a) new hires who receive no Union pension and welfare benefits for the first 3 months for pension and 6 months for welfare (and therefore no employer contributions); (b) employees who join the United Contract Holders from other driver's unions not affiliated with the Union; (c) drivers on suspension; (d) drivers on workers' compensation; (e) drivers on leave; and (f) drivers on disability.

98.     Each month the United Contract Holders are required to fight the same battle over welfare and pension contributions with the Funds and are forced to disprove the Funds'

21

demands. If the Funds do not agree with the calculations of the United Contract Holders, then the Funds simply attach the disputed amounts from the DOE service payments and the United Contract Holders struggle to get a refund.

99.    The overpayments for contributions occasioned by the Funds' faulty methodology caused the United Plaintiffs to suffer severe liquidity problems, causing the Funds to determine that the United Plaintiffs were HLPEs and not entitled to discounts and credits to which EIGSs were entitled under the Welfare Fund's Policy on Employers in Good Standing.

100.    Under the Joint Policy for Collection of Delinquent Contributions, the Funds elected to demand cash security deposits from the United Plaintiffs totaling $1,213,744.19, which they sought to attach from DOE service payments.

101.    Upon information and belief, the Funds repeatedly failed to give thirty (30) days' notice of the attachments to the United Plaintiffs before requesting the DOE to pay the attached amounts directly to the Funds, which deprived the United Plaintiffs of the ability to contest and reconcile the amounts attached.

102.    Defendants Union and Funds were and are aware of the existence of the EPP provisions contained in the DOE Contracts, as they are seeking the attachment of payments owed to the United Plaintiffs under said Contracts.

103.    Defendants Union and Funds were and are intentionally and improperly interfering with the United Plaintiffs' Contracts with DOE by, without justification, (a) calculating the contributions owed to drivers and escorts based upon flawed methodology which artificially inflated the amounts of such benefits to which the Funds were actually entitled; and (b) repeatedly attaching the service payments owed to the United Plaintiffs from defendant DOE without the requisite thirty (30) day notice.

2511460-3

104. The aforesaid conduct of defendants Union and Funds resulted in breach of the DOE Contracts.

105. The overpayments occasioned by the aforesaid conduct of defendants Union and Funds led to a loss of liquidity from which the United Plaintiffs could not recover, resulting in repeated late payments to the Union/Funds, a constant cycle of attachments in inflated amounts and, finally, to the bankruptcy filings and loss of the valuable DOE Contracts.

106. The United Plaintiffs had a reasonable expectation that the DOE Contracts for Contract Year 2010-2011 would be renewed for the following year (Contract Year 2011-2012).

107. As a direct and proximate result of defendants Union's and Funds' wrongful conduct and breach of the DOE Contracts, the Contracts were not renewed and the estates of the United Plaintiffs have been damaged in amounts to be proven at trial but not less than $1,000,000.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS OR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
#### (Against the Union and the Funds)

108. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 107 as if fully set forth herein.

109. As of the commencement of this action, the United Plaintiffs were parties to Contracts with defendant DOE pursuant to which they provided bus transportation and escort services for New York City schoolchildren.

110. Pursuant to the DOE Contracts, the United Plaintiffs had business relations with the DOE.

111. The EPP provisions of the DOE Contracts provide for monthly welfare benefits to be contributed by the United Plaintiffs to the Welfare Fund and monthly pension benefits to be

23

contributed by the United Plaintiffs to the Pension Fund on behalf of all qualified Union employees.

112. The specific obligations of the United Plaintiffs under the DOE Contracts to make contributions to the Funds are set forth in the quoted provisions in paragraphs 93 and 94 above.

113. The Union and the Funds interfered with the business relations between the United Plaintiffs and DOE by engaging in the wrongful conduct described in paragraphs 95-98.

114. The Union and the Funds acted for a wrongful purpose and/or used dishonest, unfair and improper means to calculate and collect monthly welfare and pension benefits.

115. Specifically, the Union and the Funds intentionally, recklessly or negligently utilized methodologies that artificially inflated the amounts due to them under the EPP provisions of the DOE Contracts.

116. Because the Funds artificially inflated the amounts of welfare and pension contributions they claimed were owed to them under the DOE Contracts and because they attached such inflated amounts from the DOE service payments due to the United Plaintiffs, the United Plaintiffs suffered severe liquidity problems, causing the Funds to determine that the United Plaintiffs were HLPEs and not entitled to discounts and credits to which EIGSs were entitled under the Welfare Fund's Policy on Employers in Good Standing, to the detriment of the United Plaintiffs.

117. Upon information and belief, the Union and the Funds engaged in said wrongful conduct for the sole purpose of inflicting intentional harm on the United Plaintiffs, so that the DOE would not renew the DOE Contracts and over 500 valuable bus routes would go instead to competing bus transportation companies owned and operated by certain of the Funds Trustees.

118.    By reason of the foregoing, the acts of the Union and the Funds injured the contractual relationship between DOE and the United Plaintiffs, causing the DOE not to renew the 16th Contract Extension for the Contract Year 2012-2013.

119.    As a direct and proximate result of defendants Union's and Funds' wrongful conduct and tortuous interference with business relations between the United Plaintiffs and DOE, the Contracts were not renewed and the estates of the United Plaintiffs have been damaged in amounts to be proven at trial but not less than $1,000,000.

**WHEREFORE**, the Plaintiff demands judgment:

(a) On the first cause of action, awarding Plaintiff a declaratory judgment consistent with the foregoing;

(b) On the second cause of action, awarding Plaintiff damages in an amount to be proven at trial but at least $2,407,097;

(c) On the third cause of action, awarding Plaintiff damages in an amount to be proven at trial but at least $1,000,000;

(d) On the fourth cause of action, awarding Plaintiff damages in an amount to be proven at trial but at least $1,000,000; and

(e) On the fifth cause of action, awarding Plaintiff damages in an amount to be proven at trial but at least $1,000,000.

Dated:  Central Islip, New York
      June 25, 2012           CERTILMAN BALIN ADLER & HYMAN, LLP
                           Attorneys for Plaintiff

                           By:    s/ John H. Gionis
                                  John H. Gionis (JHG 6373)
                                  90 Merrick Avenue
                                  East Meadow, New York
                                  Phone:  (516) 296-7000
                                  Email:  jgionis@certilmanbalin.com

2511460-3